In re PORTER–HAYDEN
COMPANY, Debtor.

Porter–Hayden Company, Plaintiff,

v.

First State Management Group, Inc.,
f/k/a First State Insurance
Company, Defendant.

Bankruptcy No. 02–05–4152–SD.
Adversary No. 03–5219–SD.

United States Bankruptcy Court,
D. Maryland,
at Baltimore.

Jan. 12, 2004.

William J. Bowman, Esquire, Hogan & Hartson, LLP, Washington, DC, for Defendant.

Paul M. Nussbaum, Esquire, Gardner Duvall, Esquire, Whiteford, Taylor & Preston, LLP, Baltimore, MD, for Plaintiff.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO ABSTAIN

E. STEPHEN DERBY, Bankruptcy Judge.

Defendant, First State Management Group, Inc., has filed a Motion to Abstain or Alternatively, to Stay, requesting the court to dismiss the subject adversary proceeding or in the alternative, to stay the case in favor of a pending arbitration proceeding. Plaintiff, Porter–Hayden Company, has filed an opposition to Defendant's motion and a Cross–Motion for Partial Summary Judgment, alleging that no genuine issue of material fact exists with regard to its complaint, which seeks, *inter alia*, an order that Defendant turn over to the estate $11,622,235.95 under certain insurance contracts pursuant to 11 U.S.C. § 542(b). For the reasons that follow, Defendant's Motion to Abstain will be granted.

### BACKGROUND

The following facts are alleged by Plaintiff or uncontroverted by Plaintiff. Plaintiff, an asbestos producer, and Defendant, an insurer, are parties to various insurance contracts in which Defendant is obligated to provide insurance to Plaintiff for risks associated with asbestos-related liabilities. The parties are also among the signatories of an Agreement Concerning Asbestos–Related Claims dated June 19, 1985, known as the "Wellington Agreement."[1] The Wellington Agreement contains an alternative dispute resolution clause, which

---

1. The Wellington Agreement was created in an effort to resolve disputes between asbestos producers and their insurers regarding insurance coverage for bodily injury claims related to asbestos litigation. "The Wellington Agreement did not rewrite existing policies between producers and their insurers. Rather the Agreement aimed to avoid coverage disputes by applying insurance arrangements 'in a consistent manner.'" *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1201 (3d Cir.1995).

The Wellington Agreement provided for the creation of the Asbestos Claims Facility to analyze, defend, and settle pending and future asbestos-related bodily injury claims referred to it by participating former asbestos producers. Under the agreement, funding for the payment of settlements, judgments, and legal expenses incurred in the defense of asbestos-related bodily injury claims against the party-producers was provided by the party-insurers.

But not all insurers signed the agreement, causing gaps in coverage to arise where non-signatory insurer payments were called for. Under the Wellington Agreement, party-insurers agreed to make gap-filling payments to cover the non-signatory insurers' share of defense and indemnity costs. It was recognized that this would cause the insurers to pay out their policy limits more

provides that signatory producers and insurers "shall resolve through alternative dispute resolution ... any disputed issues within the scope of the Agreement...." Wellington Agreement at § VIII, ¶ 6. Appendix C of the Wellington Agreement provides for an alternative dispute resolution process ("ADR") of three basic and progressive stages: negotiation, an arbitration proceeding, and an appellate process.

Prior to filing the petition, Plaintiff submitted to Defendant $11,622,235.95 in billings pursuant to their insurance contracts. Defendant refused to pay the obligations, arguing that Plaintiff had prematurely billed Defendant before billing other non-Wellington insurers and thus, had accelerated the payments in violation of the Wellington Agreement. The parties initiated an ADR proceeding to resolve their dispute. Subsequently, the parties engaged in arbitration pursuant to the Wellington Agreement. Thereafter, on March 15, 2002, Plaintiff filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and the arbitration proceeding was stayed.

On May 2, 2003, Plaintiff filed a complaint against Defendant for turnover under section 542(b), breach of contract, and attorneys fees. In the complaint, Plaintiff alleges that, after the ADR proceeding but prior to filing the petition, it "mooted" Defendant's contention regarding the accelerated billings by "allocating insurance claims to the [n]on-Wellington [i]nsurers, and then allocating subsequent claims to [Defendant in the amount of $11,622,-235.95]...." Plaintiff asserts that

[Defendant] now objects to the $11,622,235.95 insurance billings, because it contends that [Plaintiff] bound itself to release its claims for "non-products" coverage in order to recover on [Defendant's] unconditional obligation to pay the $11,622,235.95. Whether [Defendant's] contention regarding an agreement to release "non-products" coverage is correct remains in dispute and is the subject of the ADR Proceedings. Those proceedings, however ... cannot result in [Defendant] being excused from paying the $11,622,235.95 that is the subject of this action. Either [Defendant] immediately owes $11,622,235.95 to [Plaintiff] and it is not entitled to a release of non-products claims, or [Defendant] immediately owes $11,622,235.95 to [Plaintiff] and it is entitled to a release of non-products claims.

Accordingly, Plaintiff contends that the $11,622,235.95 in billings is property of the estate, which Defendant should be required to turn over pursuant to Section 542(b). Plaintiff further alleges that Defendant has breached the parties' insurance contracts by refusing to pay Plaintiff the insurance proceeds "due and owing."

On June 12, 2003, Defendant filed a Motion to Abstain,[2] arguing the complaint

---

quickly than they would if the non-signatory insurers were participating. In response, Section XX of the Wellington Agreement was designed to compensate signatory insurers for these interim payments. Under Section XX, producers are required to use their best efforts to obtain coverage from non-signatory insurers. To encourage producers to pursue non-signatory insurers, interest on gap-filler payments begins to accrue two years after payment is made. The producer must thereafter pay interest quarterly until the earlier of (a) a settlement with or final judicial determination against the non-signatory insurer, or (b) the date on which the signatory insurer would have exhausted its policy limits if the non-signatory insurer had been a participating party to the Wellington Agreement.

*Century Indem. Co. v. NGC Settlement Trust (In re National Gypsum Co.)*, 208 F.3d 498, 502 (5th Cir.2000).

**2.** Defendant has not yet filed an answer to the complaint.

raises non-core matters, and asserting that the court should abstain from hearing the adversary case pursuant to 28 U.S.C. § 1334(c) or, alternatively, stay the case in favor of the pending arbitration proceeding. In response, Plaintiff filed an opposition to Defendant's motion and an accompanying Motion for Partial Summary Judgment. Defendant then filed a reply in opposition to Plaintiff's motion.

## DISCUSSION

### A. Core vs. Non–Core

Defendant contends that the claims raised in Plaintiff's complaint are non-core bankruptcy proceedings[3] that could not have been commenced in this court, and therefore abstention is warranted under section 1334(c). In this regard, Defendant asserts that Plaintiff's contract claim is an action involving disputed issues over insurance coverage that were created by and arose under the scope of the Wellington Agreement, not the Bankruptcy Code, and therefore is subject to the pending arbitration proceeding in accordance with the Wellington Agreement. Defendant also asserts that Plaintiff's turnover claim is actually a breach of contract claim, which arose under the Wellington Agreement and is subject to the pending arbitration, because the $11,622,235.95 payment sought by Plaintiff is disputed and not matured. Defendant concludes, therefore, that this court should abstain from or stay the subject adversary proceeding in favor of the pending arbitration in accordance with the Wellington Agreement, per the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

In the complaint, Plaintiff maintains that the subject adversary proceeding is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O). Those subsections provide that core proceedings include: "(A) matters concerning the administration of the estate; ... (E) orders to turn over the property of the estate; ... [and] (O) other proceedings affecting the liquidation of the assets of the estate...." 28 U.S.C. § 157(b)(2)(A), (E), and (O).

The determination of whether Plaintiff's breach of contract claim and turnover claim qualify as core matters will be evaluated *seriatim.*

### 1. The Breach of Contract Claim

The distinction between "core" proceedings and "non-core" proceedings is not settled law. Notwithstanding, the United States Court of Appeals for the Fourth Circuit has held that accounts receivable and contract claims against third parties to a bankruptcy proceeding are treated as non-core when arising pre-petition and grounded in state law. *See Humboldt Express Inc. v. The Wise Co., Inc. (In re Apex Express Corp.)*, 190 F.3d 624, 631–32 (4th Cir.1999)(citing, *inter alia, Beard v. Braunstein,* 914 F.2d 434, 444–45 (3d Cir. 1990); *In re National Enterprises, Inc.,* 128 B.R. 956, 960 (E.D.Va.1991)); *see also Cibro Petroleum Prods. Inc. v. City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108, 120 (S.D.N.Y.2001) ("[A] breach of contract action by a debtor against a party to a pre-petition contract, who has not filed a claim with the bankruptcy court, is non-core.") (quoting *Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1102 (2d Cir.1993)). "The primary reason for [that] holding is that such claims fall squarely under the dictates of

---

**3.** The Bankruptcy Code divides claims in bankruptcy proceedings into two principal categories, "core" and "non-core." *See* 28 U.S.C. § 157. "Core" proceedings are matters "arising under" the Bankruptcy Code or "arising in" bankruptcy cases. 28 U.S.C. § 157(b). "Non-core" proceedings are only "related to" bankruptcy cases. 28 U.S.C. § 157(c).

*Northern Pipeline [Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)]." *Apex,* 190 F.3d at 632. That is, "Congress may not force non-consenting claimants whose claims are based on state-created private rights into non-Article III courts." *Id.* (citing *Northern Pipeline,* 458 U.S. at 70–72, 77, 81–84, 102 S.Ct. 2858).

> In so holding, the *Apex* court explained: the logic used by the courts which would treat "accounts receivable" and other basically contract claims as "core" proves too much. The main justification supplied by these courts is that because the accounts receivable are in some sense the property of the bankruptcy estate, and because the outcome of the claim will affect the bankruptcy estate (by altering its size), then the claims are "core." .... But, under this logic any claim involving a potential money judgment would be considered core, even the precise contract claim at issue in *Northern Pipeline.* Thus, the rationale used by these courts would swallow the rule established by *Northern Pipeline. See In re Orion Pictures [Corp.],* 4 F.3d [1095], 1102 [(2d Cir.1993)](to treat pre-petition contract claims as core proceedings under §§ 157(b)(2)(A) or (O) "creates an exception to *Northern Pipeline* that would swallow the rule.").

*Apex,* 190 F.3d at 632. The *Apex* court's reasoning was based in the distinction between public and private rights:

> The Court in *Northern Pipeline* observed that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power" is a public right. *Northern Pipeline,* 458 U.S. at 71[, 102 S.Ct. 2858].... Because the public rights nature of bankruptcy proceedings gives Congress the power to assign judicial functions to non-Article III bankruptcy courts, the core/non-core

distinction should depend upon the connection the claim has to this public right. *Apex,* 190 F.3d at 632.

Here, Plaintiff's contract claim is grounded in state law (not rights created by federal bankruptcy law), and arises from various pre-petition contracts with Defendant, namely, its insurance contracts covering asbestos-related liabilities and the Wellington Agreement. Defendant has not filed a proof of claim, and thus it has not consented to the jurisdiction of this court. It is conceivable that a resolution of the contract dispute with Defendant may have an impact on the administration of the estate. However, treating this contract dispute as a "core proceeding" would create an exception to *Marathon* that would "swallow the rule," as any contract action that the Plaintiff would pursue against a defendant would likely be expected to inure to the benefit of the estate and thus "concern" its "administration." *See Apex,* 190 F.3d at 632. Moreover, inasmuch as the parties have already submitted their dispute concerning Defendant's refusal to make liability payments to Plaintiff to the ADR proceeding, the claim, while related to Plaintiff's bankruptcy, is not one that could arise only in the context of a bankruptcy nor one that has an exclusive connection to a public right of debtor-creditor relations. These considerations militate against a finding that Plaintiff's contract claim is "core" to the bankruptcy, and the court so concludes.

### 2. The Turnover Action

■ At issue next is whether Plaintiff's action for turnover falls within the ambit of 11 U.S.C. § 542(b) and thus qualifies as a core proceeding.

■ A turnover proceeding under Section 542(b) is an action to compel an entity to turn over to the trustee a debt that is "property of the estate and that is ma-

tured, payable on demand, or payable on order." 11 U.S.C. § 542(b). A turnover proceeding qualifies as core only when its purpose is the "collection rather than the creation, recognition, or liquidation of a matured debt." *In re Gulf Apparel Corp.,* 140 B.R. 593, 596 (M.D.Ga.1992); *In re National Enterprises Inc.,* 128 B.R. 956, 959 (E.D.Va.1991); *Acolyte Electric Corp. v. City of New York,* 69 B.R. 155, 172 (Bankr.E.D.N.Y.1986).

■ "[F]or an action to be a turnover proceeding, it is not relevant that the defendant disputes the existence of the debt by . . . denying the complaint's allegations, as long as those allegations state the existence of a mature debt." *National Enterprises,* 128 B.R. at 959. *See also Commercial Fin. Servs., Inc. v. Bartmann (In re Commercial Fin. Servs., Inc.),* 251 B.R. 414, 423–24 (Bankr.N.D.Okla.2000)("[T]he debt need only be matured, payable on demand, or payable on order—[Section 542(b)] contains no requirement that the debt be undisputed or liquidated."); *Kenston Management Co. v. Lisa Realty Co. (In re Kenston Management Co.),* 137 B.R. 100, 107–08 (Bankr.E.D.N.Y.1992)("[I]t is not relevant that [all] the defendant[s] dispute the existence of the debt by . . . denying the complaint's allegations, as long as these allegations state the existence of a mature debt."); *Calhoun v. Copeland Corp. (In re Gordons Transps., Inc.),* 51 B.R. 633, 636 (Bankr.W.D.Tenn.1985)(rejecting argument that debt is not a matured because of a bona fide dispute); *Corzin v. Rawson (In re Rawson),* 40 B.R. 167, 170 (Bankr. N.D.Ohio 1984)("The mere fact that the defendants deny these allegations [of a matured debt] does not take the trustee's action outside the scope of section 542(b).").

■ The characterization of a lawsuit as a proceeding to compel turnover, there-fore, is not dispositive of whether the action constitutes a core proceeding; rather, this court must look behind the characterization to determine that in fact a turnover proceeding is warranted. Consequently, the determination of whether a claim qualifies as a turnover proceeding turns on whether Plaintiff's complaint alleges the existence of a mature debt. *National Enterprises,* 128 B.R. at 959. "Matured" refers to "debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event." 5 Collier on Bankruptcy ¶ 542.03 n. 1 (L. King 15th ed. rev.2003)(quoting *Calhoun v. Copeland Corp. (In re Gordons Transports, Inc.),* 51 B.R. 633, 636 (Bankr.W.D.Tenn.1985)).

Defendant contends that the underlying obligation sought by Plaintiff is disputed and not matured. In this regard, Defendant maintains that the parties entered into a settlement agreement during the mediation phase of the ADR proceeding. According to Defendant, its "obligation to pay the agreed upon amount . . . is contingent upon [Plaintiff] first . . . finalizing the settlement agreement and providing [Defendant] a full release." Defendant maintains that Plaintiff did not complete its performance and, as a result, Defendant initiated arbitration under the Wellington Agreement to enforce the settlement. Defendant reasons, therefore, that "any money allegedly owed . . . to [Plaintiff] is contingent upon and not payable until these conditions precedent are satisfied. . . ."

Defendant further asserts that even if the agreement is not upheld, the parties must arbitrate the remaining issues raised in the ADR proceeding, which include its "Wellington Agreement § XX.4 interest claim arising out of its accelerated payments on [Plaintiff's] behalf for claims that should have been paid by non-signatory insurers. . . ." Defendant argues that any

amount it may owe Plaintiff must be offset by its interest claim.

In response, Plaintiff contends that the net amount of the matured debt owed by Defendant is $6,223,602.20. In support of that contention, Plaintiff attached an affidavit from Michael J. Talbot ("Mr.Talbott"), who is a Director of Navigant Consulting—an "independent consulting firm . . . that helped to facilitate the creation of the Asbestos Claims Facility, which was one aspect of the . . . Wellington Agreement . . . [and] has allocated settlement and defense costs to [Plaintiff's] multiyear, multi-layer insurance program [since 1990]." Plaintiff's Affidavit, ¶¶ 2–4.

Mr. Talbott asserts that insurance bills under the Wellington Agreement are allocated on a "settled insurer" basis as well as an "all coverage" basis. Plaintiff's Affidavit, ¶ 7. According to Mr. Talbott, the "settled insurer" allocation represents those allocations assigned to signatory insurers for their obligation to provide coverage for asbestos-related liabilities. *Id.* at ¶¶ 5, 7–8. In contrast, the "all coverage" allocation is the amount assigned to signatory insurers who are required under Section XX, ¶ 3 of the Wellington Agreement to advance payments when there is "non-performance by non-Wellington insurers." *Id.* at ¶¶ 6, 9. He avers that $11,622,235.95 was allocated to Defendant on both "settled insurer" and "all coverage" bases in accordance with Plaintiff's "Appendix D Schedules of Insurance" and its past practice. *Id.* at ¶ 16–17. He maintains that Defendant has not paid the obligation. *Id.* at ¶ 17.

Mr. Talbott also asserts that any potential claim for interest[4] associated with previous payments by Defendant on an "all coverage" basis under Section XX, ¶¶ 3–4 would not exceed $5,398.633.75. *Id.* at ¶¶ 15, 18. He bases that calculation on, *inter alia*, the assumption that Defendant has a legitimate claim for interest arising out of Plaintiff's alleged acceleration of payments. *Id.* at ¶¶ 14–15. Mr. Talbott concludes, therefore, that Defendant would be entitled to a maximum possible setoff against the underlying obligation of $5,398,633.75, thus leaving a balance of $6,223,602.20 in " 'settled insurer' billings" unpaid to Plaintiff. *Id.* at ¶ 18.

Plaintiff maintains that this "net amount is not in dispute under the Wellington Agreement, [and] . . . is not subject to [its] arbitration provisions. . . ." Plaintiff reasons that "even if [Defendant] wins on every issue and dispute in the arbitration, it will owe and be obligated to pay nothing less than $6,223,602.20."

As noted *supra*, the determination of Plaintiff's claim as a turnover proceeding depends on whether its complaint alleges a mature debt. The complaint in this adversary proceeding alleges that the litigants are parties to various insurance contracts and the Wellington Agreement. Pursuant to those agreements, bills for asbestos related liabilities were submitted to Defendant in the amount of $11,622,235.95. The complaint further alleges that Defendant was obligated to pay that sum but refused to do so. According to the complaint, the theory supporting judicial intervention here arises from Defendant's refusal to pay Plaintiff. Thus, the complaint is attempting to collect property for the estate

---

4. As mentioned previously, when a non-Wellington insurer fails to perform for asbestos-related liabilities, the signatory insurers perform "on a pro-rata basis in lieu of the non-signatory insurance." Wellington Agreement at § XX, ¶ 3. Signatory producers who benefit from those payments, such as Plaintiff, are required to repay the amounts advanced by the signatory insurers, and to pay interest on the amounts advanced. Wellington Agreement at § XX, ¶ 4.

under Section 542(b). The question then becomes: Is the underlying debt sought by Plaintiff a mature debt?

Here, the debt at issue, *i.e.* the amount of insurance coverage owed under the Wellington Agreement, is sharply contested by Defendant. However, Defendant does not dispute that it owes the debt to Plaintiff, but rather argues that payment is (1) contingent on Plaintiff giving "full releases," and (2) subject to its interest claim under Section XX.4 of the Wellington Agreement. Plaintiff argues that the "issue regarding the release does not affect the amount of the net matured debt." That argument, however, overlooks the contention that Defendant's obligation is not payable until Plaintiff grants it a release. Apparently, that dispute is currently subject to the pending arbitration proceeding. Thus, the debt is presumably payable "only upon the occurrence of a certain act or event," namely, the determination of whether Plaintiff is required to give a release, which, as Plaintiff concedes, is subject to arbitration. Accordingly, the action seeks to create a mature debt, rather than enforce payment of an antecedent debt that is now due.

Moreover, the underlying obligation is seemingly concomitant on the results of the pending arbitration proceeding insofar as it may be offset with Defendant's Section XX.4 interest claim. In this regard, Mr. Talbott's affidavit alleges that, depending on the validity of Defendant's claim, the "matured debt" may total between $11,622,235.95 and $6,223,602.20. Defendant, of course, contends that the amount "certainly does not represent [its] view of what, if anything, is owed to [Plaintiff] pursuant to the terms of the Wellington Agreement." This court recognizes that Section 542 allows for set-offs to be asserted against Plaintiff's claim, and that

any such set-off would be part of the subject of future litigation in this case. Notwithstanding, this court also recognizes that the final and actual amount owed to Plaintiff remains unliquidated and contingent upon the disposition of the pending arbitration proceeding with respect to Defendant's interest claims. Accordingly, the debt seems far from a mature obligation payable on demand.

Therefore, in this court's view the debt alleged is not a mature debt within the meaning of Section 542(b), this action is not an equitable action for turnover under Section 542(b), and it is not a core proceeding pursuant to that section.

## B. *Abstention*

Defendant contends the court should abstain from hearing this case pursuant to either 28 U.S.C. § 1334(c)(1) or 1334(c)(2). Sections 1334(c)(1) and 1334(c)(2) provide for both permissive and mandatory abstention to be exercised in certain situations.

Under Section 1334(c)(2), abstention is mandatory when: (1) the proceeding is based on a state law cause of action; (2) the proceeding relates to a Title 11 case but is not a core proceeding; (3) the proceeding could not have been commenced in federal court absent jurisdiction provided by 28 U.S.C. § 1334; and (4) the proceeding is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction. *See* 28 U.S.C. § 1334(c)(2). As discussed above, the claims are grounded in state law and do not constitute core proceedings. Plaintiff's claims are only related to the bankruptcy case insofar as their resolution may impact the administration of the estate by potentially increasing the amount of funds available for distribution to creditors.[5] Also,

---

**5.** The accepted test for whether an action is

"related to" bankruptcy is whether "the out-

the pending arbitration proceeding may qualify as a state court action for the purposes of mandatory abstention. *See Ackerman, Herbst & Pliskow, M.D., P.A. v. Herbst (In re Ackerman, Herbst & Pliskow, M.D., P.A.),* 221 B.R. 568, 569 (Bankr.S.D.Fla.1998)(Court noted that it was justified in finding that arbitration proceeding qualified as a pending state court action but was unwilling to make that determination.). However, this case could have been commenced in federal court absent jurisdiction under 28 U.S.C. § 1334 based on diversity jurisdiction as Plaintiff is incorporated in Maryland, Defendant is a Delaware corporation, and the amount in controversy exceeds $75,000.00 (P.1, Complaint at 2, 6). *See* 28 U.S.C. § 1332(a)(1); *Blanton v. IMN Fin. Corp.,* 260 B.R. 257, 264–65 (M.D.N.C.2001)("The availability of diversity jurisdiction at the commencement of the case is enough to prevent application of the mandatory abstention provision found in § 1334(c)(2)."). Therefore, mandatory abstention does not apply.

■ The court notes that it may abstain from this case pursuant to Section 1334(c)(1), which provides that abstention is discretionary if the interests of justice or if considerations of comity warrant abstention. *See* 28 U.S.C. § 1334(c)(1).

Courts consider several factors in deciding whether to abstain under [Section] 1334(c)(1), including:

(1) efficiency in the administration of the debtor's estate;

(2) the extent to which state issues predominate over bankruptcy issues;

(3) whether the issues involve difficult or unsettled questions of state law that would be better addressed by a state court;

(4) the presence of a related proceeding commenced in state court;

(5) the existence of a jurisdictional basis other than [Section] 1334;

(6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(7) the substance rather than form of an asserted "core" proceeding;

(8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court;

(9) the burden of the federal court's docket;

(10) the likelihood that the commencement of the proceeding in federal court involves forum shopping by one of the parties;

(11) the existence of a right to a jury trial; and

(12) whether non-debtor parties are involved in the proceeding.

*MacLeod v. Dalkon Shield Claimants Trust,* 967 F.Supp. 856, 858 (D.Md.1997) (quoting *In re Eastport Assocs.,* 935 F.2d 1071, 1075–76 (9th Cir.1991)).

■ The most relevant factors in the present case are (1) efficiency in the administration of the debtor's estate, (2) the extent to which state issues predominate over bankruptcy issues, and (3) the presence of a related proceeding that has already been commenced, *i.e.* the pending arbitration proceeding, which was brought about pursuant to the mandatory ADR provision in the Wellington Agreement.[6]

come could alter the debtor's rights, liabilities, options or freedom of action ... and which in any way impacts upon the handling and administration of the bankrupt estate." *See A.H. Robins Co. v. Piccinin,* 788 F.2d 994,

1002 n. 11 (4th Cir.1986) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)).

**6.** The scope of the Wellington Agreement's arbitration clause is determined in accor-

In this regard, the ADR provision is subject to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

Under the Federal Arbitration Act (the "FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Therefore, if an issue is arbitrable under an agreement, "the FAA leaves a court without discretion; the Act dictates that the court 'shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....' " *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir.1989)(quoting 9 U.S.C. § 3). The FAA has established a "federal policy favoring arbitration," which requires that federal courts "rigorously enforce agreements to arbitrate." *Id.* (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). The presumption in favor of arbitration may be "overridden by a contrary congressional command." *Hays*, 885 F.2d at 1156 (quoting *Moses*, 460 U.S. at 24, 103 S.Ct. 927).

Given the strong federal policy favoring arbitration, a bankruptcy court should enforce an agreement to arbitrate non-core claims unless the objecting party shows that "the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of an arbitration clause." *Hays*, 885 F.2d at 1156–57. Non-core proceedings "are unlikely to present a conflict sufficient to override by implication the presumption in favor of

arbitration." *United States Lines, Inc. v. American S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re United States Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999). "[A] determination that a proceeding is core will not automatically give the court discretion to stay arbitration." *Id.* Rather, the court is still required to "determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing the arbitration clause," and the "arbitration clause should be enforced 'unless [doing so] would seriously jeopardize the objectives of the Code.' " *In re United States Lines*, 197 F.3d at 640 (quoting *Hays*, 885 F.2d at 1161). *See, e.g., Startec Global Communications Corp. v. Videsh Sanchar Nigam Ltd. (In re Startec Global Communications Corp.)*, 292 B.R. 246, 251–253 (Bankr. D.Md.2003).

As determined above, Plaintiff's claims constitute non-core matters, which arose out of the Wellington Agreement and its treatment of the pre-petition insurance contracts with Defendant, not from rights conferred or obligations imposed by the Bankruptcy Code. Thus, state issues predominate over bankruptcy issues. If this court were to try the present action, it would be limited in its ruling to issuing a report and recommendation in accordance with 28 U.S.C. § 157(c)(1) and Fed. R. Bankr.P. 9033 to the District Court, which would then be required to undertake a *de novo* review. As the resolution of these issues is currently pending in an arbitration proceeding, that proceeding represents the most economical and expeditious resolution to the dispute. The court finds, therefore, that subject claims do not pres-

dance with the Federal Arbitration Act ("FAA"). *Porter–Hayden Co. v. Century Indem. Co.*, 136 F.3d 380, 382 (4th Cir.1998). The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.*

ent a conflict with the objectives of the Bankruptcy Code sufficient to outweigh the FAA's mandate of arbitration. *See, e.g., Hays,* 885 F.2d at 1157–58. Accordingly, the Court will abstain from the instant matter pursuant to Section 1334(c)(1) and Section 3 of the FAA.

Because the court is abstaining, it will not consider Plaintiff's Cross–Motion for Partial Summary Judgment.

Therefore, upon consideration of Defendant's Motion to Abstain, or Alternatively, to Stay, the accompanying memorandum, Plaintiff's memorandum in opposition, Plaintiff's Cross–Motion for Partial Summary Judgment, Defendant's memorandum in opposition, and for the reasons stated above, it is by the United States Bankruptcy Court for the District of Maryland,

**ORDERED**, that Defendant's Motion to Abstain, or Alternatively, to Stay is hereby GRANTED; and it is further

**ORDERED**, that the court ABSTAINS from this adversary proceeding; and it is further

**ORDERED**, that the subject adversary proceeding is STAYED pending resolution of the parties' arbitration proceeding.