In re PAYTON CONSTRUCTION CORPORATION, Debtor.

Craig Jalbert, Liquidating Trust Administrator, Plaintiff

v.

Zurich American Insurance Company, Defendant.

Bankruptcy No. 07–11522–HB.
Adversary No. 08–1173.

United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

Jan. 13, 2009.

Andrew G. Lizotte, Christian J. Urbano, Hanify & King, P.C., Boston, MA, for Plaintiff.

Anne J. White, Klieman, Lyons, Schindler & Gross, Boston, MA, Josh Goldberg, Margaret M. Anderson, Fox Hefter Swibel Levin & Carroll, LLP, Chicago, IL, for Defendant.

### *MEMORANDUM OF DECISION ON MOTION OF ZURICH AMERICAN INSURANCE COMPANY TO STAY OR DISMISS ADVERSARY PROCEEDING AND COMPEL ARBITRATION*

HENRY J. BOROFF, Bankruptcy Judge.

By the motion before the court, Zurich American Insurance Company ("Zurich"), as an administrative claimant in the bankruptcy case of Payton Construction Company and the defendant in counterclaims asserted in the above-captioned adversary proceeding, seeks (i) an order compelling arbitration of its administrative claim and

of the counterclaims asserted by the plaintiff-in-counterclaim, (ii) if the court compels arbitration as to some but not all counts of the complaint, a stay pending arbitration of the counts not being arbitrated, and (iii) if the court declines to compel arbitration of Count V of the plaintiff's counterclaim, which count seeks to avoid an alleged fraudulent transfer, dismissal of that count for failure to state a claim on which relief can be granted. Craig Jalbert, as the Liquidating Trust Administrator under the confirmed liquidating plan in this case, opposes the motion. For the reasons stated below, the court will deny the motions to compel arbitration and to dismiss.

## I. FACTS AND TRAVEL OF THE CASE

Payton Construction Corporation ("Payton" or "the Debtor"), a general contractor, filed a petition for relief under chapter 11 of the Bankruptcy Code on March 16, 2007. Payton remained a debtor in possession until June 11, 2008, when the Court confirmed a liquidating plan in the case; the plan became effective on July 3, 2008. Under the plan, a liquidating trust (the "Liquidating Trust") was established and Craig R. Jalbert was appointed its Trust Administrator ("Jalbert"). Under the terms of the plan and the Liquidating Trust, all assets of the Debtor's bankruptcy estate vested in the Liquidating Trust, and the Trust Administrator was empowered to administer those assets, including by prosecution of causes of action belonging to the estate, to object to claims, and to distribute the estate's assets in satisfaction of allowed claims. The confirmed plan expressly provided for the Bankruptcy Court to have exclusive jurisdiction over all matters arising out of and related to the chapter 11 case and the confirmed plan, including determination of any objec-

tions to claims, determination of any and all contested matters and adversary proceedings, and recovery of all Liquidating Trust Assets, wherever located.

Zurich issued general liability and workers' compensation insurance policies to Payton for two prepetition periods, January 27, 2005 through January 27, 2006, and January 27, 2006 through January 27, 2007. These policies insured not only Payton but also certain of its affiliates. In connection with each policy, Payton and Zurich entered into agreements known as Deductible Agreements. In order to secure Payton's obligations to Zurich under these Deductible Agreements, Payton posted for Zurich's benefit (i) a letter of credit in the amount of $750,000 and (ii) cash collateral in the amount of $50,000. Each Deductible Agreement provides for mandatory arbitration of disputes arising thereunder: "Any dispute arising out of the interpretation, performance or alleged breach of the Agreement, shall be settled by binding arbitration administered by the American Arbitration Association[.]" The Deductible Agreements further specify that absent agreement to the contrary, the arbitration shall take place in Schaumburg, Illinois.

Zurich also issued policies to Payton for the period from January 31, 2007 to May 1, 2007, during which Payton filed its bankruptcy petition (collectively, the "2007 Policy"). Zurich does not contend that the 2007 Policy includes an arbitration clause.

On June 6, 2008, Zurich filed an application in Payton's bankruptcy case for allowance and payment of an administrative expense claim under the 2007 policy in the amount of $15,029. In the application, Zurich explained that this amount represents unpaid premiums for the 2007 Policy that are allocable to coverage for the postpetition period.[1] In the application, Zurich

---

1. Zurich has also filed a nonpriority unse-     cured claim in this case for an unspecified

further stated that the "the claims set forth herein are calculated after application of these loss funds and letters of credit." The "loss funds" and "letters of credit" in this statement appear to be references to the $50,000 escrow fund and $750,000 letter of credit that Payton posted under the Deductible Agreements. The Application does not indicate how much of the escrow funds and letter of credit Zurich drew down to reduce the amount of its postpetition claim; nor is it clear whether the amounts so drawn were applied only to amounts owing under the Deductible Agreements or also to amounts owing under the 2007 Policy.

On June 26, 2008, Payton filed, as the "complaint" in this adversary proceeding, an objection to Zurich's administrative expense claim and a five-count counterclaim against Zurich.[2] After the effective date of confirmation of the liquidating plan, Craig Jalbert, as Trust Administrator of the Liquidating Trust, moved to be substituted for Payton as the proponent of the objection and counterclaim, and that motion has been allowed.

Jalbert's objection to Zurich's administrative claim and his five-count counterclaim against Zurich are each based on two principal theories of recovery. The first is that Zurich's collateral (the escrow fund and letter of credit) exceeds reasonable loss reserves, and that the collateral value in excess of reasonable loss reserves is an asset of the bankruptcy estate and should be turned over to Jalbert as Trust Administrator. On this theory, Jalbert demands an accounting of Zurich's actual losses and projected losses (Count I), a declaratory judgment as to the reasonableness of the loss reserves established by Zurich (Count II), and turnover of such collateral as exceeds the properly-calculated loss reserves (Count III). In the second theory, Jalbert contends that payments by Payton to Zurich for insurance coverage of Payton's affiliates were fraudulent transfers under 11 U.S.C. § 548 because Payton itself, as opposed to its affiliates, did not receive reasonably equivalent value for the payments. On this theory, Jalbert demands a further accounting as to premium payments and loss reimbursements made by Payton to Zurich on account of Payton's affiliates (Count IV) and avoidance and recovery of those payments and reimbursements as fraudulent transfers under § 548 of the Bankruptcy Code (Count V). Jalbert uses these two theories of recovery in two ways. First, they form the basis of his defense against Zurich's administrative claim: Jalbert asserts these counterclaims as a setoff; in fact, he offers no defense against Zurich's administrative claim but this defense of setoff. Second, in the counterclaims, they are a basis for affirmative recovery.

Zurich has not yet filed an answer to the counterclaims. Rather, it has filed the present motion, by which it seeks (i) an order compelling arbitration of its administrative claim and of Jalbert's counterclaims, (ii) if the court compels arbitration as to some but not all counts in dispute, a stay pending arbitration of the counts not being arbitrated, and (iii) if the court declines to compel arbitration of Jalbert's fraudulent transfer count, dismissal of that

amount [Claim # 310]. That claim is not part of the instant adversary proceeding.

**2.** The assertion of an objection to claim in an adversary complaint is required where the objection is joined with a counterclaim that itself would require an adversary complaint:

"A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding." FED. R. BANKR.P. 3007(b).

count for failure to state a claim on which relief can be granted. Jalbert opposes the motion.

## II. POSITIONS OF THE PARTIES

Zurich argues that the arbitration clause in the Deductible Agreements mandates arbitration of all counts in this adversary proceeding except the fraudulent transfer count; the court has discretion only as to the fraudulent transfer count, but this count too should be referred to arbitration, Zurich argues, for the sake of judicial economy. Zurich contends that the Federal Arbitration Act ("FAA") mandates enforcement of arbitration clauses except only where overriden by a conflicting federal statute. Zurich argues that federal bankruptcy law conflicts with the FAA only where the matter at issue is a core bankruptcy proceeding within the meaning of 28 U.S.C. § 157 *and* enforcement of the arbitration agreement would inherently conflict with the purposes of the bankruptcy laws; only where both conditions are satisfied does the court have discretion not to compel arbitration. Zurich further argues that, except for the fraudulent conveyance count, the various counts at issue here are non-core and in the nature of contract disputes, not truly in the nature of turnover actions, as Jalbert maintains.

Jalbert argues that each of the counts at issue is a core proceeding within the meaning of § 157(b): Zurich's administrative claim is a claim against the estate, 28 U.S.C. § 157(b)(2)(B); Jalbert's counterclaims are counterclaims by the estate against a person, Zurich, filing a claim against the estate, § 157(b)(2)(C); the counterclaim for turnover of collateral in excess of valid loss reserves is a demand for turnover of property of the estate, § 157(b)(2)(E); as Zurich acknowledges, the fraudulent transfer count is plainly core under § 157(b)(2)(H); and all these counts are "proceedings affecting the liquidation of assets of the estate" within the meaning of § 157(b)(2)(O). Jalbert further argues that each of his counts implicates a fundamental purpose of the bankruptcy laws, that of creating a central forum in which all disputes concerning a debtor and its estate can be resolved expeditiously and without the expense and attendant inefficiencies of litigating in distant and diverse fora. Jalbert further argues that by having filed a proof of claim in this case, Zurich submitted itself to the jurisdiction of this court.

## III. DISCUSSION

### 1. The Motion to Compel Arbitration

The matters before the court include six counts—Zurich's administrative claim and Jalbert's five counterclaims. To simplify, these six may fairly be grouped into only three distinct matters for purposes of the present analysis: (i) Zurich's administrative claim, including Jalbert's objection to it ("the Administrative Claim"); (ii) Jalbert's demand for turnover of the collateral in excess of reasonable loss reserves (Count III), including the related counts for an accounting and for declaratory relief (Counts I and II), which are part and parcel of the same demand (collectively, "the Turnover Demand"); and (iii) Jalbert's fraudulent transfer count (Count V), including his related demand for an accounting of the premium payments and loss reimbursements made by Payton to Zurich on account of Payton's affiliates (Count IV) (collectively, "the Fraudulent Transfer Claim").

With respect to two of these three matters, the Administrative Claim and the Turnover Demand, Zurich is asking the Court to enforce a contractual agreement to arbitrate. With respect to the third, the Fraudulent Transfer Claim, Zurich concedes that there has been no contractu-

al agreement to arbitrate. Zurich asks the court to compel arbitration of this matter, too, but it cites no basis in contract or law for doing so; Zurich merely argues that if the Court compels arbitration as to the other two matters, it should send the Fraudulent Transfer Claim to arbitration, too, for the sake of judicial economy. Zurich's argument for arbitration of the Fraudulent Transfer Claim is thus dependent on the success of its argument as to the other two matters, so the court will begin with the Administrative Claim and the Turnover Demand.

■■■ The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, requires arbitration only of certain matters that parties have already contractually agreed to arbitrate; it presumes the existence of an agreement to arbitrate.[3] When faced with a motion to enforce an agreement to arbitrate as to claims arising under federal statutes, such as the Bankruptcy Code, the Court must conduct a two-part inquiry, asking first whether the parties agreed that the matter at issue should be resolved by arbitration and, if so, then whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.[4] If the first, "contractual" question is answered in the negative as to a particular matter, the Court cannot compel arbitration of that matter. However, if a matter is within the scope of the clause and the opposing party is bound by that clause, the Court must address the preclusion-of-waiver issue.

### a. The Contractual Issues

■■■ The first inquiry is purely contractual: did the parties agree that the matter at issue should be resolved by arbitration? This in turn involves two subsidiary issues: is the subject matter of the claim within the scope of matters to which the arbitration clause applies? And does the agreement of which the clause is a part bind the party against whom arbitration would be compelled? If either question is answered in the negative as to a particular matter, the Court cannot compel arbitration. The contractual question is one of contract law and interpretation, but with a twist:

"The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.[5]

Therefore, while applying ordinary state-law principles of contract law and interpretation to discern the parties' intentions, the Court must, as a matter of federal law, resolve doubts in favor of arbitrability.[6]

---

3. Federal Arbitration Act, 9 U.S.C. § 2.

4. *Green Tree Financial Corporation–Alabama v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 521, 148 L.Ed.2d 373 (2000) ("In determining whether statutory claims may be arbitrated, we first ask whether the parties agreed to submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.").

5. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (citations omitted).

6. *PaineWebber, Inc. v. Elahi,* 87 F.3d 589 (1st Cir.1996) ("We apply general state-law principles of contract interpretation to an arbitration agreement, but with due regard to the federal policy favoring arbitration." (internal quotations and citations omitted)).

Nonetheless, as in any contractual matter, the party seeking enforcement of the contract bears the burden of proving that the contract requires what that party is asking the court to enforce—in this instance, arbitration of two particular matters in controversy.

The arbitration clauses on which Zurich relies are two identical clauses, set forth in the 2005 and 2006 Deductible Agreements. Each clause requires arbitration as to "[a]ny dispute arising out of the interpretation, performance or alleged breach of the Agreement," meaning the Deductible Agreement of which the clause is a part. The clauses do not mandate arbitration of disputes under other agreements between the same parties, such as the 2007 Policy. Zurich does not contend that the 2007 Policy contains an arbitration clause. Nor does Zurich argue that the clauses in the Deductible Agreements apply to disputes under the 2007 Policy.

The Deductible Agreements were signed only by Zurich and Payton. Jalbert was not a signatory to either agreement. Also, Payton signed both before filing its bankruptcy petition; it did not sign them as representative of its bankruptcy estate—as might a debtor-in-possession in chapter 11—or in a fiduciary capacity for the benefit of its creditors. Jalbert now brings both the Turnover Demand and his setoff defense to the Administrative Claim by relying on Payton's prepetition rights under the Deductible Agreements. This Court has no evidence, however, that either Jalbert or Payton as debtor-in-possession waived the bankruptcy estate's rights to judicial resolution of these claims.

### (i) Turnover Demand

■ By the Turnover Demand, Jalbert seeks to enforce Payton's rights under the Deductible Agreements for the benefit of the estate. The subject matter of this demand plainly falls within the scope of the arbitration clauses in that it "arises out of the interpretation, performance or alleged breach of" the Deductible Agreements. The Trustee asserts this claim as a demand for turnover of property of the bankruptcy estate under section 542 of the Bankruptcy Code, but his arguments concerning property rights and his entitlement to turnover all rest at bottom on the terms of the Deductible Agreements.[7] The subject matter of the Turnover Demand is therefore within the scope of the arbitration clauses.

Jalbert, although not a party to the Deductible Agreements, is nonetheless bound by them as a matter of contract law. Jalbert seeks to enforce rights of Payton under the Agreements; these are not rights that inured in the first instance to him or to the estate he now represents. Rather, he is enforcing Payton's rights under the agreements by stepping into Payton's shoes. In doing so, he is subject to those contractual defenses, both substantive and procedural, that Zurich could have asserted against Payton. This Court concludes that, as a matter of contract (and without yet reaching the issue of enforceability in bankruptcy), the Turnover Demand, as asserted by Jalbert, is one to which the arbitration clauses apply.

### (ii) Administrative Claim

■ Zurich's Administrative Claim, standing by itself, would not be subject to the arbitration clauses. The claim arises

---

7. The Court does not mean that the Turnover Demand is not truly in the nature of turnover action under section 542—whether it is a turnover action or a simple breach-of-contract action is not the immediate concern—only that Jalbert's entitlement to turnover or relief of any kind is highly dependent on disputed issues of contract.

under the 2007 Policy, which contains no arbitration clause of its own and is not within the scope of arbitration clauses in the Deductible Agreements. In opposition to this Administrative Claim, however, Jalbert interposes an affirmative defense—his *only* articulated defense to the Administrative Claim—under which he employs Payton's counterclaims under the Deductible Agreements as a setoff. By doing so, Jalbert transforms the Administrative Claim into a dispute that arises out of the Deductible Agreements. His entire defense to the Administrative Claim derives from his rights of recovery under the Deductible Agreements. This Court therefore concludes that, no less than the turnover demand, and for precisely the same reasons, the Administrative Claim, as asserted against Jalbert, falls within the scope of the arbitration clauses.

### (iii)  Fraudulent Transfer Count

■ The Fraudulent Transfer Count does not arise under the Deductible Agreements. The basis of this count is Jalbert's argument that, by virtue of the 2005 and 2006 policies and the related Deductible Agreements, Payton and Zurich effected a fraudulent transfer, in contravention of the rights of Payton's creditors. Though it focuses on a transfer effected in part under the Deductible Agreements of which the arbitration clauses were a part, it does not arise under those agreements. Rather, the Fraudulent Transfer Count arises under 11 U.S.C. § 548, is predicated on an injury not to Payton but to its creditors, and is being prosecuted by Jalbert on behalf of the bankruptcy estate and the creditors to whom Jalbert is obligated by the confirmed plan to distribute its assets. It therefore is not one to which the arbitration clauses apply, and Zurich does not contend otherwise.

### b.  The Enforceability Issues

Having concluded that the arbitration clauses apply to the Turnover Demand and the Administrative Claim, the Court must proceed to determine whether they should be enforced. In relevant part, the Federal Arbitration Act ("FAA") states:

> A written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. By its terms, this provision renders valid and enforceable those contractual provisions that (a) are written, (b) appear in contracts evidencing a transaction involving commerce, and (c) provide for the settlement by arbitration of a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof. The arbitration clauses in the Deductible Agreements plainly satisfy these three requirements.

But enforcement of these arbitration clauses and those like them in similar contexts would have the potential to disrupt the complex edifice of rights, procedures, and jurisdiction established by other federal statutes—the Bankruptcy Code and related jurisdictional statutes (and the rules issued pursuant to these)—for the handling of bankruptcy cases and all civil proceedings arising in or relating to them. The matters at issue are not simple disputes between two parties to a contract. Zurich's counterparty in both matters is not Payton but Jalbert as representative of

the bankruptcy estate.[8] These matters arise in a bankruptcy case and, in part, under core provisions of the Bankruptcy Code that create a bankruptcy estate, govern the adjudication and priority of claims against the estate, and require an estate representative—whether a trustee in bankruptcy, a debtor-in-possession, or, as in this instance, a fiduciary exercising the rights of a bankruptcy trustee pursuant to a confirmed liquidating plan—to collect and liquidate estate assets for the benefit of creditors. Moreover, these matters were commenced in the bankruptcy court, where such matters routinely are prosecuted and which Congress created precisely to handle matters of this kind. The question that remains, however, is whether the Federal Arbitration Act nonetheless requires that these matters be handled in arbitration.

The Supreme Court has provided the beginning of an answer to that question:

> Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.... If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from the statute's text or legislative history or from an inherent conflict between arbitration and the statute's underlying purposes.

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226–27, 107 S.Ct. 2332, 2337–38, 96 L.Ed.2d 185 (1987) (up-

holding enforceability of agreements to arbitrate as to Securities Exchange Act and RICO claims) (internal citations and quotations omitted). *McMahon* thus recognizes that the Arbitration Act may be overriden by contrary Congressional command in another federal statute. To that end, *McMahon* requires a showing that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue, and it places the burden of such proof on the party opposing enforcement of the arbitration clause.

The parties and authorities agree that neither the text nor the legislative history of the Bankruptcy Code and related statutes clearly expresses a Congressional intention to preclude (or not) a waiver of judicial remedies for the statutory rights under the Code. In such circumstances, *McMahon* provides that courts may deduce the requisite proof of Congressional intent "from an inherent conflict between arbitration and the statute's underlying purposes." *McMahon*, however, did not involve claims asserted in bankruptcy, and the Supreme Court has not yet determined the extent to which the Bankruptcy Code and related jurisdictional statutes evince a Congressional intention to preclude a waiver of judicial remedies for matters arising in bankruptcy cases. Nor is there binding precedent on the issue within the First Circuit.

Numerous courts have by now opined on the issue, but with diverse results. The leading case is *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum)*, 118 F.3d 1056 (5th Cir.1997) ("*National Gypsum*"), whose holding has been followed by three other courts of appeal and by

---

8. Moreover, though Payton did initially file the objection to claim and counterclaim that Jalbert is now prosecuting, it did so as a debtor in possession in its chapter 11 case,

and therefore as a fiduciary for the benefit of the bankrupt estate, not merely as Payton in its own right.

three bankruptcy courts within this circuit.[9] The analysis commended by these cases may be summarized as follows: the bankruptcy court lacks discretion to refuse to compel the arbitration of matters not involving "core" bankruptcy proceedings under 28 U.S.C. § 157(b); and even when a proceeding is core, the bankruptcy court may decline to enforce an otherwise applicable arbitration agreement only when (a) the underlying nature of a proceeding derives exclusively from the provisions of the Bankruptcy Code (not from prepetition legal or equitable rights of a debtor) (the "arising-under requirement") and (b) the arbitration of the proceeding would conflict with the purpose of the Code (the "inherent conflict requirement").

This test has two problems. First, the Supreme Court stated in *McMahon* that where there exists an inherent conflict between arbitration and a statute's underlying purposes, arbitration should not be compelled. Under the *National Gypsum* test, however, such an inherent conflict would not be enough to avert arbitration. Arbitration would still be required, despite this inherent conflict, if the underlying action did not arise under the Bankruptcy Code itself, as opposed to non-bankruptcy law. The arising-under requirement is extraneous to the Supreme Court's own prescription and would serve to require arbitration even where, under *McMahon*, a court discerns a Congressional intent to preclude a waiver of judicial remedies. The arising-under requirement is therefore both superfluous to *McMahon* and potentially at cross-purposes with it.

This is especially true because, as explained below, Congress deliberately gave the bankruptcy court jurisdiction over many matters related to bankruptcy cases that do not arise under the Bankruptcy Code precisely because the widest possible jurisdiction is often crucial to the success of a reorganization, the maximization of value for creditors, or the protection of debtors in bankruptcy. Even many "core" proceedings—for example, claims against the estate, disputes over the validity and extent of liens, disputes over exemptions claimed under non-bankruptcy law—do not arise exclusively under the Bankruptcy Code but are routinely adjudicated in the bankruptcy court by Congressional design.

The second difficulty in the *National Gypsum* analysis is like the first: it removes all discretion as to noncore matters simply because they are noncore and without regard to whether there exists an inherent conflict between arbitration of the matter and the underlying purposes of the bankruptcy laws. In *National Gypsum* itself, the Fifth Circuit Court of Appeals recognized that the core-noncore distinction in 28 U.S.C. § 157 was designed to serve a jurisdictional purpose and not to determine whether there exists an inherent conflict between arbitration of a matter and the bankruptcy laws' underlying purposes. *National Gypsum*, 118 F.3d at 1067. For that reason, the Fifth Circuit rejected a position that would categorically have deemed arbitration of core bankruptcy proceedings inherently irreconcilable with the Bankruptcy Code. For the same reason, noncore matters should not, a *priori*, be channeled into arbitration without benefit of an inherent-conflict analysis: the core or noncore status of a particular pro-

---

**9.** *In re Electric Machinery Enterprises., Inc.,* 479 F.3d 791, 796 (11th Cir.2007); *In re Mintze,* 434 F.3d 222, 231 (3rd Cir.2006); *In re Crysen/Montenay Energy Co.,* 226 F.3d 160, 166 (2d Cir.2000); *Gandy v. Gandy (In re Gandy),* 299 F.3d 489, 495 (5th Cir.2002); *In re Merrill,* 343 B.R. 1, 9 (Bankr.D.Me.2006); *In re Cavanaugh,* 271 B.R. 414, 424–426 (Bankr.D.Mass.2001); *Sternklar v. Heritage Auction Galleries, Inc. (In re Paul),* 2008 WL 4844768 (Bankr.D.Mass.2008).

ceeding is not a dispositive indicator of whether arbitration of the matter would conflict with a purpose of the Bankruptcy Code.

■ A bankruptcy case is a centralized and collective proceeding for which a special court and special rules were created. These exist to facilitate the expeditious and relatively inexpensive resolution of all matters relating to a particular bankruptcy case, so as to make reorganization possible, enhance a debtor's fresh start, and, where applicable, maximize value and expedite recovery for creditors. In view of the unique and collective nature of bankruptcy cases, of the creation of this special forum for adjudication of matters in bankruptcy, and of the establishment of an elaborate body of rules for adjudication of bankruptcy-related proceedings in the Bankruptcy Court, there arises a presumption that Congress intended for the Bankruptcy Court to be the principal and usual, if not exclusive, forum for most matters in bankruptcy, and that it should be available to debtors, creditors, and the estate representatives for bankruptcy purposes. Some matters can go elsewhere, and not every proceeding filed in Bankruptcy Court belongs there; the bankruptcy jurisdictional statutes do permit a court to abstain in certain circumstances. See 28 U.S.C. § 1334(c). But these exceptions mostly serve to prove the general rule.

Both the Administrative Claim and the Turnover Demand are core proceedings. The Administrative Claim, as a claim against the bankruptcy estate, is defined as a core proceeding by 28 U.S.C. § 157(b)(2)(B) (core proceedings include "allowance of disallowance of claims against the estate"). The Turnover Demand is also a core proceeding in several respects: it is a counterclaim by the estate against an entity that has filed a claim against the estate, § 157(b)(2)(C) (core

proceedings include "counterclaims by the estate against persons filing claims against the estate"); a proceeding to determine the validity or extent of Zurich's interest in Payton's collateral, § 157(b)(2)(K) (core proceedings include "determinations of the validity, extent, or priority of liens"); a demand for a turnover order, § 157(b)(2)(E) (core proceedings include "orders to turnover property of the estate"); and a proceeding to liquidate assets of the estate, Payton's claims against Zurich under the Deductible Agreements, § 157(b)(2)(O) (core proceedings include "other proceedings affecting the liquidation of assets of the estate"). In all material respects, these are ordinary, everyday bankruptcy matters, well within the scope of matters that Congress intended that bankruptcy courts would handle.

For the adjudication of bankruptcy rights and oversight of bankruptcy cases, Congress created bankruptcy courts and, through the District Courts, gave to them original and exclusive jurisdiction over bankruptcy cases (28 U.S.C. §§ 1334(a) and 157(a)). With respect to matters concerning the liquidation of the estate and the adjudication of claims against it, it is significant that Congress also gave to the bankruptcy court (again, through the federal district court) exclusive jurisdiction over all property of the debtor as of the commencement of the case and of the bankruptcy estate (28 U.S.C. §§ 1334(e)(1) and 157(a)).

The bankruptcy estate is itself a creature of the bankruptcy laws, 11 U.S.C. § 541(a). It comes into existence only at the commencement of the bankruptcy case and constitutes a separate entity from the debtor. The trustee in bankruptcy serves as the representative of the estate. 11 U.S.C. § 323(a). Even in those chapter 11 cases in which the debtor remains a debtor-in-possession and there is no trustee,

the debtor-in-possession represents the estate in a fiduciary capacity, exercising, as to the estate, the rights, powers, and certain duties of a trustee. 11 U.S.C. § 1107(a). In this case, the confirmed plan transferred the assets of the estate to the Liquidating Trust, and it gave to Jalbert, as Trust Administrator, the powers of a trustee in bankruptcy, to be exercised for the benefit of creditors.

Jalbert has not waived his or the Liquidation Trust's right to a judicial determination of the matters at issue here; nor, during this bankruptcy case, did Payton, as debtor-in-possession, execute such a waiver. The Bankruptcy Code contains no such waiver of rights. Nor, in view of Congress' grant of exclusive jurisdiction over property of the estate to the bankruptcy court, is any such waiver implicit in the bankruptcy laws.

The enforcement of the arbitration agreement as to the present matters would force Jalbert to litigate these matters in a distant forum and under unfamiliar rules, at appreciable expense to the estate and with considerable delay. If arbitration clauses were regularly enforced as to such routine bankruptcy matters, these clauses would soon multiply in ordinary consumer credit agreements, and trustees and debtors would consequently be forced to adjudicate routine bankruptcy matters in diverse fora in every case, with (for example) each objection to claim being arbitrated in a different forum. This in turn would undermine a system that was designed precisely to avoid such dissipation of the parties' energies and the estate's resources.

The Court summarizes the above considerations as follows. The matters at issue concern the bankruptcy estate, including both a claim against it and a counterclaim

to recover and liquidate certain of its assets. Congress, through the District Court, gave to the Bankruptcy Court both exclusive jurisdiction over the estate and wide jurisdiction over matters related to the bankruptcy case to facilitate the expeditious and inexpensive liquidation of estate assets and adjudication of claims against the estate. Considerations of expedience are as real and pertinent in this case as they usually are in bankruptcy liquidations. And Jalbert, the estate, and the creditors—the real parties in interest here—have not waived *their* right to a judicial determination of these matters. In view of these considerations, the Court finds that there would be an inherent conflict between arbitration and the bankruptcy laws' underlying purposes with respect to the matters at issue, and that Congress intended to preclude a waiver of judicial remedies for such matters. The motion to compel arbitration will therefore be DENIED.

## 2. The Motion to Dismiss

■ Zurich also moves to dismiss Count V, the Fraudulent Transfer Claim, for failure to state a claim on which relief can be granted. Zurich argues that this count merely parrots the language of 11 U.S.C. § 548(a)(1)(B), under which the claim is asserted, and is so lacking in specifics—notably, the dates and amounts of the transfers in question—that it falls far short of the particularity standard in FED.R.CIV.P. 9(b) for claims of fraud, even allowing for the relatively relaxed requirement for constructive fraud.[10] Jalbert opposes this motion, arguing that (i) that the heightened pleading standard does not apply to this count, both because the count is being asserted by a third-party trustee

---

**10.** Jalbert is challenging the transfers only as *constructively* fraudulent; he makes no allega-

tion of actual intent to hinder, delay, or defraud.

and because this count alleges only constructive, not actual, fraud, (ii) this count does not fail to state a claim on which relief can be granted, and (iii) even if the allegations are insufficiently particular, the appropriate remedy is not to dismiss but to require amendment.

The Court agrees with Jalbert that this count does not fail to state a claim on which relief can be granted: it alleges the necessary elements for avoidance of a transfer under § 548(a)(1)(B), and Zurich does not contend otherwise. Moreover, it identifies the transfers in question with sufficient specificity at least to overcome a Rule 12(b)(6) challenge. These are identified variously as payments made by Payton to Zurich "on or within two years before the Petition Date on account of insurance coverage attributable to the Affiliates" (Count V at ¶ 30), "all premiums and loss payments made by the Debtor on account of insurance coverage attributable to the affiliates" ("Wherefore" ¶ 4), and "any premium, deductible, or loss payment ... made by the Debtor [Payton] to Zurich within two years of the Petition Date on account of insurance coverage attributable to the Affiliates" ("Wherefore" ¶ 5). While Count V does not identify specific payments by amount, date, and manner effected, it does give a time frame and specify the nature of the transfers that Jalbert is seeking to avoid. The Court is confident that the descriptions thus provided will permit the parties, as they proceed with discovery, to distinguish the transactions at issue from those that are not. Jalbert cannot at this stage be required to do more. He is an outsider to these transactions and will need discovery to identify the specific transactions by date, amount, and the manner in which they were effected. Accordingly, the motion to dismiss Count V will be DENIED.

## IV. CONCLUSION

For the reasons set forth above, the Motion of Zurich American Insurance Company to Stay or Dismiss Adversary Proceeding and Compel Arbitration will be DENIED.

An Order in conformance with this Memorandum of Decision shall issue in conjunction herewith.