**IN RE: E & G WATERWORKS, LLC, Debtor**

**Jonathan R. Goldsmith, Chapter 7 Trustee, Plaintiff**

v.

**Macri Associates, Inc., Defendant**

**Case No. 15–40816–EDK**
**Adversary Proceeding Case No. 16–4106**

United States Bankruptcy Court, D. Massachusetts, Central Division.

Signed July 27, 2017

Jonathan R. Goldsmith, Goldsmith, Katz & Argenio, P.C., Springfield, MA, pro se.

Patrick Birney, Robins & Cole LLP, Hartford, CT, Peter Strniste, One Boston Place, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION

Elizabeth D. Katz, United States Bankruptcy Judge

Before the Court is the "Motion to Compel Arbitration" (the "Arbitration Motion") filed by Macri Associates, Inc. ("Macri"), the defendant in this adversary proceeding. Through the Arbitration Motion, Macri seeks an order compelling the plaintiff, Jonathan R. Goldsmith, Chapter 7 trustee (the "Trustee"), to arbitrate the Trustee's claim for turnover under § 542(b) of the United States Bankruptcy Code[1] as well as additional claims for recovery based on various state law theories. At a hearing on the Arbitration Motion held on June 30, 2017, the Court announced that the motion would be denied, and stated that a memorandum of decision detailing its reasons for the denial would be forthcoming. After further review of the circumstances of the case and the relevant law, the Court remains persuaded that its bench ruling was correct and the Arbitration Motion will be denied.

## I. BACKGROUND AND POSITIONS OF THE PARTIES

E & G Waterworks, LLC (the "Debtor") operated as a water pipeline repair and construction business prior to filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on April 27, 2015. Prior to the bankruptcy filing, the Debtor provided services to Macri as subcontractor on a construction project at the University of Hartford in Connecticut. Under their agreement (the "Agreement"), entered into in March 2014, the Debtor was to be paid a total of $123,000. On the petition date, according to the Debtor's business records (including an invoice attached to the adversary complaint), Macri

1. See 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code" or the "Code"). All statutory references are to provisions of the Bankruptcy Code unless otherwise stated.

owed $79,950 to the Debtor for services performed and materials provided for the project (the "Receivable"). As Macri acknowledged in the Arbitration Motion, and counsel confirmed in open court, it is undisputed that the Debtor provided all of the services and materials required by the Agreement. Arbitration Motion, at ¶ 25.

On December 19, 2016, the Trustee commenced this adversary proceeding against Macri to collect the Receivable. The four-count complaint alleges primarily that the Receivable is subject to turnover pursuant to 11 U.S.C. § 542(b) (Count I). In the alternative, the Trustee relies on state-law theories to support his right to collect payment from Macri, namely, claims for account stated (Count II), breach of contract (Count III), and quantum meruit/unjust enrichment (Count IV).[2]

In its answer to the complaint, Macri generally denies that it is obliged to turnover the remaining funds due under the contract. Notably, nowhere does Macri deny the amount or validity of the debt *per se,* but appears to raise an argument that the amount owed to the Debtor should be offset by some amount owed to Macri on account of the Debtor's failure to provide "an extended warranty for its work," which Macri says was required by the Agreement.[3]

Macri then filed its Arbitration Motion, asking the Court to force the Trustee to arbitrate the claims raised in the adversary proceeding, arguing that an arbitration clause in the Agreement should be enforced here. Macri says the relief sought by the Trustee is a non-core, run-of-the-mill state-law breach of contract claim and should be submitted to arbitration. The Trustee maintains that the turnover count is a core proceeding under the Bankruptcy

Code, which should stay with this Court for resolution. The Trustee also asserts that Macri is essentially trying to seek a postpetition setoff against a prepetition claim in contravention of the Bankruptcy Code. After the June 30, 2017 hearing at which the Court announced its intention to deny the Arbitration Motion, the matter was taken under advisement.

## II. DISCUSSION

The Agreement between the Debtor and Macri provides that "[a]ll disputes will be resolved through binding arbitration with the CT Industry of Arbitration rules of the American Arbitration Association." Trustee Opp., Ex. B. The Federal Arbitration Act ("Arbitration Act") "establishes a federal policy favoring arbitration," *Shearson/American Exp., Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)), and makes clear that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In the bankruptcy context, a bankruptcy court "may stay a proceeding if an issue involved is covered by an arbitration agreement, and order the parties to proceed to arbitration in accordance with the terms of the agreement." *Sternklar v. Heritage Auction Galleries, Inc. (In re The Rarities Group, Inc.),* 434 B.R. 1, 7 (D. Mass. 2010) (citing 9 U.S.C. §§ 3, 4). However, the Arbitration Act's mandate to enforce an arbitration clause can be superseded by a "contrary congressional command."

---

**2.** Each heading of counts II, III and IV of the Trustee's complaint specifically describes the count as "Alternative Count."

**3.** Macri also raises other affirmative defenses, none of which were supported by any factual detail or legal explanation as to why those defenses are applicable here.

*McMahon,* 482 U.S. at 226, 107 S.Ct. 2332; *see also Rarities Group,* 434 B.R. at 7 ("If Congress intended to preclude a waiver of judicial remedies for certain statutory rights, the [Arbitration Act] does not compel courts to enforce an otherwise valid arbitration.").

■ Whether a court should compel arbitration is a two-part inquiry. *Rarities Group,* 434 B.R. at 7–8. The court must first determine whether the dispute before it falls within the scope of the relevant arbitration clause. If so, the court then determines "whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2010). The burden is on the party seeking arbitration as to the first part of the inquiry; it is on the party resisting arbitration as to the second. *Rarities Group,* 434 B.R. at 8 (citing *InterGen N.V. v. Grina,* 344 F.3d 134, 142 (1st Cir. 2003) and *Green Tree,* 531 U.S. at 90, 121 S.Ct. 513).

■ Whether the relevant arbitration clause covers the instant dispute is an issue of contract law. *Green Tree,* 531 U.S. at 90, 121 S.Ct. 513; *Rarities Group,* 434 B.R. at 8. Generally, courts "should apply ordinary state-law principles that govern the formation of contracts" to determine "whether the parties agreed to arbitrate a certain matter." *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). State contract law, however, must be applied "with due regard to the federal policy favoring arbitration." *PaineWebber, Inc. v. Elahi,* 87 F.3d 589 (1st Cir. 1996); *see also In re Payton Const. Corp.,* 399 B.R. 352, 358 (Bankr. D. Mass. 2009) ("while applying ordinary state-law principles of contract

law and interpretation to discern the parties' intentions, the Court must, as a matter of federal law, resolve doubts in favor of arbitrability").

Here, the arbitration clause uses broad language, indicating that "all" disputes should be subject to arbitration. Courts interpreting similar language have found that such clauses are "broad enough such that the presumption of 'arbitrability' is applicable." *First Sealord Sur., Inc. v. TLT Constr. Corp.,* 765 F.Supp.2d 66, 72–73 (D. Mass. 2010); *see also Payton,* 399 B.R. at 359 (turnover demand was within the scope of the arbitration provision). The Trustee seeks turnover of property of the bankruptcy estate under § 542 of the Code. Because the right to turnover arises from the Debtor's performance under the Agreement, the Court finds that this matter falls within the scope of the Agreement's arbitration clause.[4]

The second, and more complex issue is whether Macri is correct in its assertion that the arbitration clause must be enforced here. In *Shearson/American Express, Inc. v. McMahon,* the Supreme Court established a general framework for evaluating this question. 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (upholding enforceability of agreements to arbitrate Securities Exchange Act and RICO claims). The Court held that:

> The burden is on the party opposing arbitration to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue .... If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from the statute's text or legislative history *or from an inherent con-*

4. The fact that the Trustee is not a party to the Agreement does not change the analysis regarding the scope or enforceability of the arbitration clause. *See Payton,* 399 B.R. at 359.

flict between arbitration and the statute's underlying purposes.

*Id.* at 226–27, 107 S.Ct. 2332 (emphasis supplied). "*McMahon* thus recognizes that the [Arbitration Act] may be overridden by contrary Congressional command in another federal statute." *Payton*, 399 B.R. at 361.

■ As the *Payton* court noted, however, *McMahon* was not a bankruptcy case, and "the extent to which the Bankruptcy Code and related jurisdictional statutes evince a Congressional intention to preclude a waiver of judicial remedies for matters arising in bankruptcy cases" is far from concretely established. *Id.* Neither the express text nor the legislative history of the Bankruptcy Code is instructive. *See In re Electric Machinery Enterprises, Inc.*, 479 F.3d 791, 796 (11th Cir. 2007) (citing *Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*, 434 F.3d 222, 231 (3d Cir. 2006)); *Rarities Group*, 434 B.R. at 9; *Payton*, 399 B.R. at 361. As such, the primary question for a bankruptcy court is whether arbitrating the dispute poses an "inherent conflict" with the Bankruptcy Code. The results have been mixed.

■ Although not universal, there is general agreement in the case law that bankruptcy courts must compel the arbitration of non-core bankruptcy proceedings. Some courts adopt a *per se* approach, seeming to conclude that arbitration of non-core matters simply would not conflict with the objectives of the Code. *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1161 (3rd Cir. 1989); *see also, e.g., Electric Machinery*, 479 F.3d at 796 ("In general, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a noncore proceeding."); *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006); *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 625 (6th Cir. 2003); *Ins. Co. of N. Am. v. NGC Settle-*ment Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum) 118 F.3d 1056, 1066 (5th Cir. 1997). Others are more nuanced in their approach. *See, e.g., Rarities Group*, 434 B.R. at 10 ("For both core and non-core claims, then, a bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the Bankruptcy Code."); *Payton*, 399 B.R. at 362. (non-core matters "should not, *a priori*, be channeled into arbitration without the benefit of an inherent conflict analysis"). As a general proposition, however, "the presumption in favor of arbitration usually trumps the lesser interest of the bankruptcy courts in adjudicating non-core proceedings." *Hill*, 315 F.3d at 108.

With respect to core bankruptcy proceedings, a somewhat similar divergence in approach has occurred. In one of the leading cases on the enforceability of arbitration clauses in bankruptcy proceedings, *In re National Gypsum Co.*, the Fifth Circuit held that "not all core bankruptcy proceedings are premised on provisions of the Code that 'inherently conflict' with the [Arbitration Act]" and rejected a binary distinction between core and non-core matters with respect to a bankruptcy court's authority to refuse to enforce arbitration agreements. 118 F.3d 1056 at 1067. The *National Gypsum* court focused on the underlying basis of the rights asserted:

[W]here the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by a debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed

power of a bankruptcy court to enforce its own orders.

*Id.* at 1069. Thus, under *National Gypsum*, the bankruptcy court only has the discretion to refuse to enforce an otherwise applicable arbitration agreement "when (a) the underlying nature of a proceeding derives *exclusively* from the provisions of the Bankruptcy Code ... (the "arising-under requirement") and (b) the arbitration of the proceeding would conflict with the purpose of the Code (the "inherent conflict requirement")." *Payton*, 399 B.R. at 361 (emphasis supplied). Several courts have adopted this approach. *See, e.g.*, *In re Thorpe Insulation Co.*, 671 F.3d 1011 (9th Cir. 2012); *Electric Machinery*, 479 F.3d 791; *Mintze*, 434 F.3d 222; *Rarities Group*, 434 B.R. at 10.

In *In re White Mountain Mining Co., L.L.C.*, however, the Fourth Circuit suggested that, with regard to core proceedings, the general presumption is that arbitration inherently conflicts with the Bankruptcy Code. 403 F.3d 164, 168–69 (4th Cir. 2005). *White Mountain*, a chapter 11 case, "involved the core issue of whether ... advances to the debtor were debt or equity." *Id.* at 170. The court recognized that "[t]he very purpose of bankruptcy is to modify the rights of debtors and creditors," and that "Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts." *Id.* at 169 (quoting 1 *Collier on Bankruptcy*, ¶ 3.02[2] (15th ed. Rev. 2005) (quotation omitted)). The court was troubled by arbitration of core matters, as "permitting an arbitrator to decide a core issue would make the debtor-creditor rights contingent upon an arbitrator's ruling rather than the ruling of a bankruptcy judge assigned to hear the debtor's case." *Id.* (internal citation omitted).

■ Core proceedings "normally involve rights derived from bankruptcy law" and "depend on the Bankruptcy Code for their existence." *Sheridan v. Michels (In re Sheridan)*, 362 F.3d 96, 108–09 (1st Cir. 2004), Bankruptcy courts have exclusive jurisdiction over matters concerning the liquidation of the estate and the adjudication of claims against it. 28 U.S.C. §§ 1334(e)(1) and 157(a). Moreover, pursuant to statute, core matters specifically include "matters concerning the administration of the estate;" *Id.* § 157(b)(2)(A), "orders to turn over property of toe estate;" *Id.* § 157(b)(2)(E), and "other proceedings affecting toe liquidation of the assets of the estate or toe adjustment of the debtor-creditor ... relationship," with two exceptions not applicable here.[5] *Id.* § 157(b)(2)(O).

Pursuant to § 542(b), "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. § 542(h). There is abundant case law on the question of whether a § 542(b) turnover action is a core or non-core proceeding. For those courts finding that a turnover action may be a core matter, however, the general consensus is that "[a] turnover proceeding qualifies as core only when its purpose is the 'collection rather than creation, recognition, or liquidation of a matured debt.'" *In re Porter–Hayden Co.*, 304 B.R. 725, 731–32 (Bankr. D. Md. 2004) (quoting *In re Gulf Apparel Corp.*, 140 B.R. 593, 596 (M.D. Ga. 1992); *National Enterprises, Inc. v. Koger Partnership, Ltd. (In re National Enterprises, Inc.)*, 128 B.R. 956, 959 (E.D. Va. 1991); *Acolyte Electric Corp. v. City of New York*, 69 B.R.

**5.** Personal injury torts and wrongful death claims are excluded.

155, 172 (Bankr. E.D.N.Y. 1986)). Some courts conclude that the existence of a dispute as to the debt does not alter the analysis, "as long as [the trustee's] allegations state the existence of a mature debt." *Porter–Hayden*, 304 B.R. at 732 (quoting *National Enterprises*, 128 B.R. at 959) (collecting cases).[6]

■ Matured debts are those that are "presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event." *Porter–Hayden*, 304 B.R. at 732 (internal citations omitted); *see also Calhoun v. Copeland Corp. (In re Gordons Transports, Inc.)*, 51 B.R. 633, 636 (Bankr. W.D. Term. 1985). Here, even Macri agrees that "the labor and materials were performed at some point between March 24, 2014 and June 13, 2014. And the [Debtor's] invoice was submitted to [Macri] on June 13, 2014." Arbitration Motion, at ¶ 25. Further, the Agreement makes clear that the Debtor's invoice became due and payable "within 30 days of [Macri's] receipt of the invoice." Trustee Opp., Ex. B. Nowhere does Macri suggest any facts to support its contention that it is not liable for the debt owed to the Debtor. Accordingly, the Court finds that it is undisputed that the Receivable matured in July 2014 and collection of the Receivable is properly brought as a § 542(b) turnover demand.

Some courts, however, have held that a § 542(b) turnover proceeding is not core "[w]hen a bona fide dispute exists as to liability involving state law." *United Security & Communications, Inc. v. Rite Aid Corporation (In re United Security &* *Communications, Inc.)*, 93 B.R. 945, 958 (Bankr. S.D. Ohio 1988).[7] Here, Macri raises the specter of a dispute by generally denying liability. The only substantive reply to the Trustee's turnover action, however, is found in its affirmative defenses, where Macri says that the Debtor breached the contract by failing to provide an extended warranty.

The Court concludes, however, that this defense does not give rise to a bona fide dispute as to liability such that this action should be considered non-core. First, there is no allegation that the parties were involved in prepetition negotiations or discussions, to say nothing of litigation, in which Macri was contesting the existence or scope of its liability to the Debtor. In fact, this warranty argument is unsupported by the record and, in some instances, contradicted by the documents provided to the Court. Trustee Opp., Ex. A.

■ The only reference to a warranty in the Agreement between the parties is the Debtor's statement in its proposal, with regard to the type of liners it would be installing, that "[t]he liners once installed will hold a 20 year warranty under normal conditions" and "[a]ll *material* is guaranteed to be as specified." Trustee Opp., Ex. A. (emphasis added). The warranty referenced in the Agreement appears to be for the product only, not the installation services provided by the Debtor. Given these specific circumstances, the Court simply cannot view this particular debt as the subject of a bona fide dispute. Macri's "mere refusal to pay" the amount

**6.** *See also Smith v. McLeskey (In re Bay Vista of Virginia, Inc.)*, 394 B.R. 820, 836–37 (Bankr. E.D. Va 2008); *Commercial Financial Services, Inc. v. Jones (In re Commercial Financial Services, Inc.)*, 251 B.R. 397, 410 (Bankr. N.D. Okla. 2000); *Hoarty v. Bennett Transportation (In re Best Refrigerated Express, Inc.)*, 132 B.R. 420, 421 (Bankr. D. Neb. 1991); *Allegheny, Inc. v. Laniado Wholesale* Co. (In re Allegheny, Inc.), 68 B.R. 183, 190 (Bankr. W.D. Pa. 1986).

**7.** *See also Mec Steel Buildings, Inc. v. San Lorenzo Construction Corp. (In re Mec Steel Buildings, Inc.)*, 136 B.R. 606, 610 (Bankr. D.P.R. 1992); *National Enterprises*, 128 B.R. at 959.

owed the Debtor under the Agreement based on its claim that the sums due may be setoff by a claim against the Debtor for failure to provide a warranty, "does not take the . . . action outside the scope of section 542(b)," as the obligation to the Debtor is a mature debt "and the statutory text specifically provides for the defense asserted by [Macri]." *Enron Energy Services, Inc. v. Columbia Gas Transmission Corp. (In re Enron Corp.)*, 2006 WL 2400082, *7 (Bankr. S.D.N.Y. June 15, 2006). Accordingly, the Court rules that the Trustee's collection of the Receivable is a core proceeding under 28 U.S.C. § 157(b)(2) ; *see also Payton*, 399 B.R. at 363.[8]

Mindful that, pursuant to a substantial amount of case law, arbitration proceedings are not necessarily in conflict with core proceedings under the Bankruptcy Code, *see, e.g., National Gypsum*, 118 F.3d at 1067; *Rarities Group*, 434 B.R. at 10, the Court must also determine whether there is an inherent conflict between arbitration and the Trustee's right to compel turnover pursuant to § 542(b).

▮▮▮▮ "A bankruptcy case is a centralized and collective proceeding for which a special court and special rules were created." *Payton*, 399 B.R. at 363. The bankruptcy process is "intended to centralize disputes about a debtor's assets and legal obligations." *White Mountain*, 403 F.3d at 169 (citing *Grady v. A.H.*

*Robins Co.*, 839 F.2d 198, 201–02 (4th Cir. 1988)). Bankruptcy courts

> exist to facilitate the expeditious and relatively inexpensive resolution of all matters relating to a particular bankruptcy case, so as to . . . maximize value and expedite recovery for creditors. . . . in view of the unique and collective nature of bankruptcy cases, of the creation of this special forum for adjudication of matters in bankruptcy, and of the establishment of an elaborate body of rules for the adjudication of bankruptcy-related proceedings in the Bankruptcy Court, there arises a presumption that Congress intended the Bankruptcy Court to be the principal and usual, if not exclusive, forum for most matters in bankruptcy, and that it should be available to debtors, creditors, and the estate representatives for bankruptcy purposes.

*Payton*, 399 B.R. at 363.

The creation of the bankruptcy estate and the appointment of a trustee to administer assets and represent the bankruptcy estate derive exclusively from the bankruptcy Code. 11 U.S.C. §§ 541, 701. The Bankruptcy Code bestows a trustee with a plethora of substantive rights and charges a trustee with the fiduciary duty to exercise those powers for the benefit of all creditors. *See e.g.*, 11 U.S.C. §§ 541–549, 704(a). One of the specifically enumerated powers of a trustee in bankruptcy is to demand turnover, from any entity, of "a

---

**8.** The Court recognizes that there is authority to the contrary, indicating or implying that actions to collect accounts receivable can never be considered core proceedings under the Code. *See, e.g., McCrary & Dunlap Construction Co., LLC v. CED Construction Partners, Ltd. (In re McCrary & Dunlap Construction Co., LLC)*, 256 B.R. 264, 267 (Bankr. M.D. Tenn. 2000) (collecting cases). This Court declines to adopt a *per se* rule, as the core/noncore determination is better made based on the particular facts and circumstances of each case. *See, e.g., Sheridan v. Michels (In re Sheri-*

*dan)*, 362 F.3d 96, 110 (1st Cir. 2004) (noting that core/non-core determination is made on the "particular circumstances" of the case). And as to some of the cases cited as adopting a *per se* rule, a closer reading reveals that many do not reject the possibility that a turnover action may, in the appropriate case, be a core matter; rather, they concluded that under the particular circumstances of the case before them, the issues raised were non-core. *See, e.g., Mec Steel*, 136 B.R. at 610; *National Enterprises*, 128 B.R. at 959; *United Security*, 93 B.R. at 958–959.

debt that is property of the estate and that is matured [and] payable on demand." 11 U.S.C. § 542(b). As discussed above, this power is a core bankruptcy function and does not exist independent of the bankruptcy case; i.e., the trustee is not required to file suit in every jurisdiction in order to collect outstanding matured debts, but may use the centralized bankruptcy forum to liquidate moneys owing to the estate. Bankruptcy courts are ideally suited and well equipped to address turnover demands, including any defenses thereto.

As such, § 542(b) is integral to the bankruptcy case administration process. A turnover demand is a simple, efficient mechanism to collect matured debts currently due to the bankruptcy estate; it is not the equivalent of a breach of contract action. *Id.*; *see Heller Ehrman LLP v. Gregory Canyon Ltd. (In re Heller Ehrman LLP)*, 461 B.R. 606, 608 (Bankr. N.D. Cal. 2011) (a suit "arising out of breach of contract, absent more than has been alleged here, is not a turnover action under § 542). The turnover process avoids the time and expense that would be required if a trustee had to act piecemeal, employing special or local counsel and commencing disconnected, individual civil actions in foreign fora to collect every debt owed to a debtor. To require the arbitration of a turnover demand under § 542(b) and decentralize the bankruptcy process where, as here, there is no question as to the liability of the defendant and the amount of the debt, would undermine the trustee's power to seek a quick and inexpensive resolution of outstanding, matured debts for the benefit of all creditors. "If arbitration clauses were regularly enforced as to such routine bankruptcy matters ... [it] would undermine a system that was designed precisely to avoid such dissipation of the parties' energies and the estate's resources." *Payton*, 399 B.R. at 364.

Accordingly, the Court rules that arbitration would inherently conflict with the Trustee's right to demand turnover, pursuant to § 542(b), of the matured debt owed to the Debtor by Macri. The Arbitration Motion will therefore be denied as to Count I.

Counts II–IV are non-core and, in this instance, arbitration would not inherently conflict with the Bankruptcy Code. However, the Trustee has pled those counts in the alternative and seeks relief duplicative of the relief sought pursuant to § 542. Allowing the simultaneous prosecution of the turnover count in this Court and arbitration of the state-law claims not only wastes estate resources, but also runs the risk of inconsistent rulings. Accordingly, the Court will order that further proceedings with regard to Counts II–IV are stayed pending a resolution of Count 1. *See Drennen v. Certain Underwriters at Lloyd's of London (In re Residential Capital, LLC)*, 563 B.R. 756, 774 (Bankr. S.D.N.Y. 2016) (staying arbitration of some counts pending resolution of other counts remaining with the court); *Allstate Ins. Co. v. Elzanaty*, 929 F.Supp.2d 199, 220 (E.D.N.Y. 2013) (district court had authority to stay pending arbitrations and enjoin future private arbitrations pending litigation where "[i]t would severely threaten any judgment of [the c]ourt to have pending arbitrations or future arbitrations result in inconsistent rulings with regard to [pending litigation]"); *Togut v. RBC Dain Consultant Services (In re S.W. Bach & Co.)*, 425 B.R. 78, 100–101 (Bankr. S.D.N.Y. 2010) (staying arbitration of some counts pending resolution of non-arbitrable claims); 11 U.S.C. § 105(a).

An order shall issue forthwith.